In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-1786

A.C., a minor child by his next friend, mother and legal guardian, M.C.,

*Plaintiff-Appellee*,

*v.*

METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE and FRED KUTRUFF, in his official capacity as Principal of John R. Wooden Middle School,

*Defendants-Appellants*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-02965-TWP-MPB — **Tanya Walton Pratt**, *Chief Judge*.

_____

No. 22-2318

B.E. and S.E., minor children by their next friend, mother and legal guardian, L.E.,

*Plaintiffs-Appellees*,

*v.*

VIGO COUNTY SCHOOL CORPORATION and PRINCIPAL OF TERRE HAUTE NORTH VIGO HIGH SCHOOL, in his official capacity,

*Defendants-Appellants*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:21-cv-00415-JRS-MG — **James R. Sweeney, II**, *Judge*.

_____

ARGUED FEBRUARY 15, 2023 — DECIDED AUGUST 1, 2023

_____

Before EASTERBROOK, WOOD, and LEE, *Circuit Judges*.

WOOD, *Circuit Judge*. A.C., B.E., and S.E. are three boys
with a simple request: they want to use the boys' bathrooms
at their schools. But because the three boys are transgender,
the districts said no. The boys sued the districts and the school
principals, alleging sex discrimination in violation of Title IX
of the Education Amendments Act of 1972 and the Equal Pro-
tection Clause of the Fourteenth Amendment. The boys also
requested preliminary injunctions that would order the
schools to grant them access to the boys' bathrooms and, in
the case of B.E. and S.E., access to the boys' locker rooms when
changing for gym class. The district courts in both cases
granted the preliminary injunctions, relying on our decision
in *Whitaker ex rel. Whitaker v. Kenosha Unified School District No.
1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017).

In this consolidated appeal, the school districts invite us to
reverse those preliminary injunctions and revisit our holding
in *Whitaker*. We see no reason to do so, however. Litigation
over transgender rights is occurring all over the country, and
we assume that at some point the Supreme Court will step in
with more guidance than it has furnished so far. Until then,
we will stay the course and follow *Whitaker*. That is just what

the district courts did, in crafting narrowly tailored and fact-bound injunctions. We affirm their orders.

## I

### A. *A.C.*'s Case

A.C. is a 13-year-old boy who lives with his mother M.C. in Martinsville, Indiana. A.C. is transgender and has identified as a boy since he was about eight years old. He socially transitioned when he was nine, meaning he began going by a male name, using male pronouns, and adopting a typically masculine haircut and clothing. He has never wavered from this identity since his social transition.

A.C. receives professional medical care from the Gender Health Program at Riley Children's Health, where he was diagnosed with gender dysphoria, a condition that causes him to experience "a marked incongruence between [his] experienced/expressed gender and [his] assigned gender." American Psychiatric Ass'n, *Diagnostic and Statistical Manual* 452 (5th ed. 2013). A.C.'s gender dysphoria comes with "significant distress, depression, and anxiety." He receives therapy as well as prescribed hormonal suppression drugs that block his menstruation. He intends to begin testosterone supplements, which will further masculinize his appearance, once he is able. Additionally, the Indiana courts have authorized both a legal name change and a gender-marker change for him. A.C. and his medical care providers agree that being treated as a boy is the best way to ameliorate his depression and anxiety. This includes access to bathrooms and facilities that are consistent with his experienced gender identity. We refer to this as gender-affirming facility access.

In 2021 A.C. began seventh grade at John R. Wooden Middle School in the Metropolitan School District of Martinsville, Indiana. The school maintains sex-segregated bathrooms—a practice that A.C. does not challenge. At the beginning of the school year A.C.'s stepfather contacted the school to ask that A.C. be granted gender-affirming bathroom access. The school refused and said that A.C. had to use either the girls' bathrooms or the unisex bathroom in the health clinic. But A.C. could not use the girls' bathrooms because it exacerbated his dysphoria and exposed him as transgender to his classmates. The health clinic bathroom was unsatisfactory because it was far from A.C.'s classes and stigmatized him. A.C. had to ask permission and sign into the health office each time he used it.

Martinsville did accommodate A.C. by refraining from punishing him for tardiness caused by his use of the health clinic bathroom. It also offered A.C. the option to attend school entirely online, but A.C. declined. For a time, A.C. defied the school's orders and used the boys' bathrooms. He immediately felt more comfortable at school and better about himself. No students raised any issues or questioned A.C.'s presence, but a staff member reported him. The school responded by telling A.C. that he would be disciplined if he continued using the boys' bathrooms.

A.C. felt isolated and punished by the school because of his transgender status. This affected his academic performance. Before middle school, A.C. earned good grades and was in the gifted and talented program. At Wooden, he found it difficult to attend school. His education was disrupted, his grades fell, and he became depressed, humiliated, and angry.

He tried to avoid using the bathroom while at school, which was distracting, uncomfortable, and medically dangerous.

Martinsville has an unofficial policy for handling gender-affirming bathroom access for transgender students at the high school level. The district evaluates each bathroom-access request based on an extensive list of factors: the length of time the student has identified as transgender; whether the student is under a physician's care; whether the student has been diagnosed with gender dysphoria; whether the student receives hormone treatment; and whether the student has received a legal name change or gender-marker change. A.C. attempted to show the school district that he qualified for an accommodation based on these criteria, but Martinsville said the policy could not be implemented in the district's middle schools and refused to change its position.

In December 2021, A.C. filed this lawsuit against Martinsville and Fred Kutruff, Wooden's principal, seeking declaratory and injunctive relief that would assure his access to gender-affirming bathrooms. On April 29, 2022, the district court granted A.C.'s motion for a preliminary injunction and issued the mandatory stand-alone order on May 19, 2022. See Fed. R. Civ. P. 65(d). The injunction prohibited Martinsville from "stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom."

### B. *B.E. & S.E.*'s Cases

B.E. and S.E. are 15-year-old twins who live in Terre Haute, Indiana, with their mother L.E. They attend Terre Haute North Vigo High School. They are transgender boys who socially transitioned at age 11, when they adopted male names, male pronouns, and traditionally masculine

appearances. Like A.C., both B.E. and S.E. were diagnosed
with gender dysphoria and are receiving professional care at
the Riley Gender Health Clinic. Under the Clinic's supervi-
sion, the boys have received testosterone treatment since No-
vember 2021. This treatment causes the cessation of menstru-
ation and the development of deeper voices, facial and body
hair growth, and increased muscle mass. B.E. and S.E. ob-
tained legal name changes and gender-marker changes in In-
diana state court. Unrelated to their gender identity, both B.E.
and S.E. have a condition that impedes colon function and re-
quires them to take laxatives, making bathroom access a par-
ticularly sensitive issue.

The twins used the boys' bathrooms at North Vigo at the
beginning of the 2021–2022 school year; no students raised
concerns about their presence there. School employees, how-
ever, informally reprimanded B.E. and S.E. and told them not
to use the boys' bathrooms again. Their mother had a meeting
with the vice principal to alert the school to both the gender
dysphoria diagnoses and the colon conditions of the two
boys. She requested that they be granted gender-affirming fa-
cility access, including access to the boys' locker rooms to
change before and after gym class. B.E. and S.E. confirmed
that they planned to use the stalls in the locker room to change
in privacy and did not seek access to the locker room showers.
The school denied their request; it instructed them to use ei-
ther the girls' bathrooms or the unisex bathroom in the
school's health office. They could change for gym class only
in the girls' locker room or the health office bathroom.

B.E. and S.E. found this solution profoundly upsetting. Us-
ing the girls' bathrooms and locker rooms revealed them as
transgender, and they worried about upsetting female

students who might wonder why boys were in those facilities. B.E. and S.E. also had problems with the unisex bathroom. It was far from their classrooms, and the health office was locked at unpredictable times. B.E. suffered at least one embarrassing accident because of his colon condition and inability to get to the health office bathroom on time. Both boys missed time in class because they had to use a remote bathroom, and they felt stigmatized by the requirement. As a result, they tried to avoid using the bathroom while at school—again, a practice that is painful, distracting, and medically dangerous. They dreaded going to school and suffered depression and humiliation.

Vigo County has an official policy regarding bathroom access for transgender students. It contemplates accommodating transgender students based on a smorgasbord of factors, including: the student's age; the gender marker on the birth certificate; the duration of the social transition; whether the student has name and pronoun change requests on file with the School Corporation; the student's gender dysphoria diagnosis; the receipt of hormone treatment; the duration of hormone treatment; the receipt of other transition-related medical procedures; other medical conditions; concerns raised by other students or parents; facility restrictions; and accommodations offered to other similarly situated students. At the same time, North Vigo insisted that surgical change was required before a transgender student could use gender-affirming bathrooms. That rule rendered most of the policy nugatory—Indiana prohibits such surgery for patients younger than 18 (the great majority of high school students), and some transgender persons opt not to undergo surgical transition given the risks and costs of the procedure. See *Whitaker*, 858 F.3d at 1041.

After North Vigo refused to grant B.E. and S.E. gender-affirming facility access, the boys filed this lawsuit against Vigo County School Corporation and the principal of the high school. On June 24, 2022, the district court granted their motion for a preliminary injunction and issued a stand-alone order compelling the school district to provide B.E. and S.E. "with access to the boys' restrooms and locker room, excluding the showers." The district court rested its decision on their likelihood of success under Title IX; it did not reach their constitutional theory.

Both Martinsville and Vigo County appealed the issuance of the preliminary injunctions. At the request of the parties, we consolidated the cases on appeal.

## II

For a preliminary injunction to issue, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Orders granting or denying preliminary injunctive relief are immediately appealable. 28 U.S.C. § 1292(a)(1). Our review depends on the kind of issue we are considering: "[w]e review the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion." *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (alteration in original) (quoting *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016)).

## A.  *Whitaker* and *Bostock*

We begin by addressing the appellants' contention that our decision in *Whitaker* is no longer authoritative, given a change in the law governing preliminary injunctions or, in the alternative, given the Supreme Court's intervening decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

The plaintiff in *Whitaker* (A.W.) was a 17-year-old transgender boy who sued the Kenosha (Wisconsin) Unified School District, alleging that the refusal to allow him to use the boys' bathrooms violated his rights under Title IX and the Fourteenth Amendment. *Whitaker*, 858 F.3d at 1042. A.W. socially transitioned when he was 13 and received professional care for gender dysphoria. When he sought gender-affirming facility access, however, he was told that he could use only the girls' bathrooms or a unisex bathroom in the school's main office, which was far from his classes. He felt that using the remote unisex bathroom drew undesirable attention to his transgender status. *Id.* at 1040.

Like the plaintiffs in our cases, A.W. attempted to restrict his water intake in order to avoid any bathroom use. This exacerbated a preexisting medical condition—vasovagal syncope—making him susceptible to headaches, fainting, and seizures. He tried ignoring the school's orders and using the boys' bathrooms. Again as in the present case, no students complained but school employees did. He sought an accommodation with evidence of his prolonged social transition, his gender dysphoria diagnosis, and his doctor's recommendation that he be allowed to use gender-affirming facilities, but to no avail. The school district insisted that A.W. had to update his gender in the school's records, which the school would do only if he provided an amended birth certificate.

This put him up against a brick wall: under Wisconsin law, the records would not be changed without surgical transition, but those procedures are unavailable to minors, risky, and expensive. A.W. reported feeling distressed, depressed, and suicidal as a result. See *id.* at 1041–42, 1053.

We held that A.W.'s worsening mental and physical health, coupled with his suicidality, meant that the harm was irreparable and could not be adequately remedied at law. *Id.* at 1045–46. We added that since this was not a "typical tort action" about past harm, but instead a case where the harms were prospective and ongoing, that monetary damages would be insufficient. *Id.* at 1046. We concluded that A.W. had demonstrated a likelihood of success on both his Title IX and Fourteenth Amendment claims. Notably, we did not criticize the defendant school district's decision to maintain sex-segregated bathrooms. Our focus was on the district's policy for "decid[ing] which bathroom a student may use." *Id.* at 1051.

For the Title IX claim, we were guided by analogy to *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and its holding that discrimination based on sex-stereotyping violates Title VII of the Civil Rights Act of 1964. *Whitaker*, 858 F.3d at 1047. We reasoned that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Id.* at 1049.

For A.W.'s Fourteenth Amendment claim, we applied intermediate scrutiny to the defendant school district's bathroom access policy, because it was "based upon a sex classification." *Id.* at 1051. We therefore required the defendants to provide an "exceedingly persuasive" justification for their policy. *Id.* at 1051–52 (quoting *United States v. Virginia*, 518 U.S.

515, 533 (1996)). The proffered justification the school gave was the need "to protect the privacy rights of all 22,160 students." *Id.* at 1052. We found this unconvincing (more or less the opposite of "exceedingly persuasive") because there was no evidence that A.W. was less discreet than other students while using the bathroom or that the stall doors in the bathrooms did not provide adequate privacy to all. *Id.*

Finally, we affirmed the district court's balancing of the harms. The school district's claims of harm were "speculative," especially because, prior to the lawsuit, A.W. had used the boys' bathrooms for almost six months without incident. This supported a finding that the district court did not abuse its discretion by finding that the privacy rights of other students were not invaded and that no other negative consequences materialized. *Id.* at 1054.

*Whitaker* answers almost all the questions raised by these consolidated appeals. But the school districts offer three reasons why we ought to revisit that decision. First, they urge that *Whitaker* was partially abrogated by *Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). Second, they point out that the Supreme Court has provided intervening guidance on how to analyze issues of transgender discrimination in *Bostock*. Third, they contend that *Whitaker* did not adequately grapple with a provision in Title IX that permits educational institutions to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686. We address those arguments in turn.

### 1. Standard for Likelihood of Success on Merits

In *Whitaker*, we applied the now-abrogated standard for evaluating the likelihood of success on the merits under

which a plaintiff had to show only that he had a "better than negligible" chance of success on the merits. 858 F.3d at 1046. That standard is now gone. In *Nken v. Holder*, in the closely related context of a stay pending judicial review, the Supreme Court went out of its way to say that "[i]t is not enough that the chance of success on the merits be better than negligible.'" 556 U.S. 418, 434 (2009). Adhering to that guidance in *Illinois Republican Party*, we concluded that the showing must be a strong one, though the applicant "need not show that [he] definitely will win the case." 973 F.3d at 763. The school districts contend that this shift has weakened *Whitaker*'s authoritative value.

Perhaps there are some cases that have been affected by the need to make a more compelling showing of likelihood of success, but *Whitaker* is not one of them. *Whitaker* did not even hint that the likelihood of success on the merits was a close issue or that anything hinged on the better-than-negligible threshold. Furthermore, both district courts in the cases now before us applied the correct standard and came out the same way, finding that the law and the evidentiary records established the necessary strong likelihood of success.

The crucial question for the Title IX theory in both of the cases now before us, just as in *Whitaker*, is one of law: how does one interpret Title IX's prohibition against discrimination "on the basis of sex" as applied to transgender people? In *Whitaker*, we answered that discrimination against transgender students is a form of sex discrimination. Our answer to that legal question did not depend on the plaintiff's evidentiary showing, and that answer does not change with a more rigorous threshold for success on the merits. It is also telling that, in the closely related area of Title VII law, the

Supreme Court held in *Bostock* that discrimination based on transgender status is a form of sex discrimination. 140 S. Ct. at 1744. Both Title VII, at issue in *Bostock,* and Title IX, at issue here and in *Whitaker*, involve sex stereotypes and less favorable treatment because of the disfavored person's sex. *Bostock* thus provides useful guidance here, even though the particular application of sex discrimination it addressed was different.

## 2. *Bostock*

Though *Bostock* strengthens *Whitaker*'s conclusion that discrimination based on transgender status is a form of sex discrimination, the school districts argue that a different part of *Bostock* undermines *Whitaker*. They are referring to the Court's decision to refrain from addressing how "sex-segregated bathrooms, locker rooms, and dress codes" were affected by its ruling. *Id.* at 1753. The school districts reason that the Court exercised this restraint because it saw a fundamental difference between bathroom policies and employment decisions. From that, they conclude that *Bostock*'s definition of sex discrimination does not apply in the bathroom context.

That is reading quite a bit into a statement that says, in essence, "we aren't reaching this point." The Supreme Court, and for that matter our court, does this all the time. It is an important tool with which we respect the principles of party presentation, see *United States v. Sineneng-Smith,* 140 S. Ct. 1575, 1579 (2020), and incremental development of the law. It is best to take the Court at its word. When we do so, we see that it was simply focusing on "[t]he only question before [it]," which did not involve gender-affirming bathroom access. *Bostock*, 140 S. Ct. at 1753.

Applying *Bostock*'s reasoning to Title IX, we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes. As *Bostock* instructs, we ask whether our three plaintiffs are suffering negative consequences (for Title IX, lack of equal access to school programs) for behavior that is being tolerated in male students who are not transgender. See *id.* at 1741. Our decision in *Whitaker* followed this approach.

### 3. Relevance of 20 U.S.C. § 1686

The last alleged flaw in *Whitaker* that the school districts see is its supposed failure to mention 20 U.S.C. § 1686. That statute, which is part of Title IX, reads as follows:

> Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

If *Whitaker* had failed to take that admonition into account, maybe there would be a problem. But it did no such thing. *Whitaker* cited the relevant implementing regulation, 34 C.F.R. § 106.33, which affirmatively permits recipients of educational funds to "provide separate toilet, locker room, and shower facilities" on the basis of sex, provided that the separate facilities are comparable. We noted that neither Title IX nor its implementing regulations define the term "sex," and in looking to case law for guidance, we saw nothing to suggest that "sex" referred only to biological sex. *Whitaker*, 858 F.3d at 1047. We concluded that bathroom-access policies that engaged in sex-

stereotyping could violate Title IX, notwithstanding 34 C.F.R. § 106.33.

Similarly, section 1686 is of little relevance to this appeal. Though it certainly permits the maintenance of sex-segregated facilities, we stress again that neither the plaintiff in *Whitaker* nor the plaintiffs in these cases have any quarrel with that rule. The question is different: who counts as a "boy" for the boys' rooms, and who counts as a "girl" for the girls' rooms—essentially, how do we sort by gender? The statute says nothing on this topic, and so nothing we say here risks rendering section 1686 a nullity.

We also reject the notion that *Whitaker* (and perhaps *Bostock* itself) make it impossible to have "truly sex-separated bathrooms." That argument presupposes one definition of sex, as something assigned at birth or a function of chromosomal make-up. But Title IX does not define sex. Dictionary definitions from around 1972 (when Title IX was passed) are equally inconclusive. See, *e.g.*, Black's Law Dictionary, *Sex* (4th ed. 1968) (defining sex narrowly as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism" and broadly as "the character of being male or female"); Webster's New World Dictionary, *Sex* (2d ed. 1972) (defining sex both "with reference to … reproductive functions" and broadly as "all the attributes by which males and females are distinguished"). There is insufficient evidence to support the assumption that sex can mean only biological sex. And there is less certainty than meets the eye in such a definition: what, for instance, should we do about someone who is intersex? There are several conditions that create discrepancies between external and internal sex markers, which can produce XX males or XY females, or other

chromosomal combinations such as XXY or XXX that affect overall sexual development. People with this genetic make-up are entitled to Title IX's protections, and an educational institution's policy for facility access would fail to account for them if biological sex were the only permissible sorting mechanism. Narrow definitions of sex do not account for the complexity of the necessary inquiry.

The implementing regulations do not provide much additional guidance. When 34 C.F.R. § 106.33 was codified, it was published without public comment because it was viewed as working "no substantive changes." Department of Education, Establishment of Title 34, 45 Fed. Reg. 30802, 30802 (May 9, 1980). With no indication that 34 C.F.R. § 106.33 was meant to cover any more ground than 20 U.S.C. § 1686, we reject the school districts' presupposition that separate facilities for the sexes forecloses access policies based on gender identity. Nothing in section 1686 requires this outcome.

### 4.   Existing Circuit Split

Finally, there is already a circuit split on the issues raised in this appeal. The Fourth Circuit has decided that denying gender-affirming bathroom access can violate both Title IX and the Equal Protection Clause, while the Eleventh Circuit found no violations based on substantially similar facts. Compare *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), with *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (*en banc*).

It makes little sense for us to jump from one side of the circuit split to the other, particularly in light of the intervening guidance in *Bostock*. As we have noted before:

> Overruling circuit law can be beneficial when the circuit is an outlier and can save work for Congress and the Supreme Court by eliminating a conflict. Even when an overruling does not end the conflict, it might supply a new line of argument that would lead other circuits to change their positions in turn. Finally, overruling is more appropriate when prevailing doctrine works a substantial injury.

*Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (*en banc*).

These factors do not weigh in favor of overruling *Whitaker*. We cannot resolve the conflict between the Fourth and Eleventh Circuits on our own. Nor can we supply a new line of argument. Much of what is needed to resolve this conflict is present in the majority opinion and four dissents offered by the Eleventh Circuit in *Adams*; neither party here has broken new ground. Finally, consistency on our part does not cause a serious harm. *Whitaker* has been the governing decision in our circuit since 2017, and the school districts have not identified any substantial injuries it has caused. As a result, "[o]verruling would not be consistent with a proper regard for the stability of our decisions." *Id.* at 565.

### B. Preliminary Injunctions

Having resolved the question of *Whitaker*'s authoritative value, we are now free to apply it to these cases. We address the factors governing a preliminary injunction—likelihood of success on the merits, irreparable harm, and the balance of equities, including the public interest—in that order.

1.   Likelihood of Success on the Merits

The first, and normally the most important, criterion is likelihood of success on the merits. As we noted earlier, the plaintiffs had to make a strong showing of their chance of pre-vailing. See *Illinois Republican Party*, 973 F.3d at 763. For the Title IX claims, they had to demonstrate that they were "sub-jected to discrimination under any education program or ac-tivity receiving Federal financial assistance," and that this dis-criminatory treatment was "on the basis of sex." 20 U.S.C. § 1681(a). For the Equal Protection Clause (involved in only A.C.'s case), they had to show intentional discrimination on the basis of sex. See *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31 (1994).

It is not disputed that Wooden Middle School and North Vigo High School receive federal funding and are covered by Title IX. The point of contention is whether the school dis-tricts' refusal to grant gender-affirming facility access to the plaintiffs amounts to discrimination on the basis of sex. Both district courts decided that the plaintiffs had made a suffi-ciently strong showing of sex discrimination. We see no errors in those conclusions.

Using *Whitaker* as a guide, both district courts evaluated the school districts' facility access policies, not their decisions to maintain sex-segregated facilities. The courts then rea-soned that an access policy that punished a student for their transgender identity would violate Title IX, see *Whitaker*, 858 F.3d at 1049, and that A.C., B.E., and S.E. all showed they were punished by the school districts' access policies. Like the plaintiff in *Whitaker*, they were threatened with discipline if they used the boys' bathrooms. All three reported feeling de-pressed, humiliated, and excluded by the requirement to use

either the girls' bathrooms or the unisex bathroom. B.E. and
S.E. were also placed at an increased risk of not making it to
the bathroom on time because of their colon conditions. As a
result, just as in *Whitaker*, the "gender-neutral alternatives
were not true alternatives because of their distant location to
[plaintiffs'] classrooms and the increased stigmatization they
caused [plaintiffs]." *Id.* at 1050. And in A.C.'s case, offering re-
mote schooling and therefore denying a transgender student
the opportunity to socialize with and learn alongside his
classmates is not a true alternative. Further, the harms that the
plaintiffs suffered meet *Bostock*'s definition of sex discrimina-
tion, which requires that the plaintiff be treated worse than a
similarly situated person because of sex. 140 S. Ct. at 1740.
Here, the school districts persisted in treating the three plain-
tiffs worse than other boys because of their transgender sta-
tus.

The plaintiffs in *B.E./S.E.* asked the district court to include
access to both bathrooms and locker rooms in the injunction,
and the court obliged. It reasoned that the "distinction" be-
tween bathrooms and locker rooms was "immaterial," partic-
ularly since B.E. and S.E. "would use the stalls in the locker
room, just as they used the stalls in the restroom," and com-
munal showers were by consent carved out of the injunction.
We see no clear error in the district court's factual conclusion
that B.E.'s and S.E.'s locker room use would be comparable to
their bathroom use. Vigo County argues that nothing in the
district court's injunction confines the plaintiffs to the stalls,
and so (it believes) B.E. and S.E. "may change in the open ar-
eas of the locker room, exposing their physical anatomy to
their classmates, and vice versa." But this argument is unteth-
ered to the evidentiary record. Both B.E. and S.E. averred that
the stalls in the locker room would allow them and other

students to change privately, and that students do not disrobe entirely or use the locker room showers during the school day. As a result, the district court's conclusion that locker room use would be indistinguishable from bathroom use in this instance is not clearly erroneous.

The district court in A.C.'s case also decided that A.C. had made a strong showing of likely success on his Fourteenth Amendment claim. Per *Whitaker*'s guidance, Martinsville's access policy relies on sex-based classifications and is therefore subject to heightened scrutiny. 858 F.3d at 1051. "[A] party seeking to uphold government action based on sex must establish an exceedingly persuasive justification' for the classification." *Virginia*, 518 U.S. at 524 (quoting *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724 (1982)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 516.

The school district attempted to justify its access policy by invoking the privacy concerns of other students. The district court found, however, that the privacy concerns "appear[] entirely conjectural." See also *Whitaker*, 858 F.3d at 1052 ("[T]he School District's privacy argument is based upon sheer conjecture and abstraction."). No students complained about A.C.'s use of the bathroom. Martinsville insists that such evidence is unnecessary and that the privacy interest in protecting students from "exposure of their bodies to the opposite sex" is long-protected, legitimate, and clearly related to denying gender-affirming facility access. But the district is fighting a phantom. Gender-affirming facility access does not implicate the interest in preventing bodily exposure, because there is no such exposure. This is unlike the nudity ordinance that we contemplated in *Tagami v. City of Chicago*, 875 F.3d 375 (7th

Cir. 2017), where bodily exposure was expressly and directly at issue. There is no evidence that any students will be exposed to A.C. or vice versa. "Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Whitaker*, 858 F.3d at 1052. Martinsville has not identified how A.C.'s presence behind the door of a bathroom stall threatens student privacy.

In addition to the likelihood of success on the Title IX and equal protection claims, we note also that the school districts in these two cases may be violating Indiana law. Given that all three plaintiffs have received amended birth certificates and legal name changes that identify them as boys, they appear to be boys in the eyes of the State of Indiana. If so, then it would be contrary to Indiana law for the school districts to treat A.C., B.E., and S.E. as though they are not boys and to require them to use the girls' bathrooms and locker rooms. But no plaintiff has pursued this theory of state-law violation, and so we do not explore it further.

We add a few words about the scope of our decision. First, we are addressing only the issue before us. We express no opinion on how Title IX or the Equal Protection Clause regulates other sex-segregated living facilities, educational programs, or sports teams. The district courts took the same approach in the injunctions they issued, properly confining their analysis to the immediate problem.

We also leave the door open to reasonable measures taken by the school districts to ensure that a student genuinely needs the requested accommodations. Just like the plaintiff in *Whitaker*, A.C., B.E., and S.E. have all provided ample evidence of their medical diagnoses and the care they receive

from professionals to assist in their transitions. They have also demonstrated that their gender identities are enduring. All three have legal name changes and gender-marker changes. B.E. and S.E. have been receiving testosterone treatment for over a year. These are not cases where the plaintiffs' good-faith requests for gender-affirming facility access could be questioned. Nor do these cases present the scenario offered by Indiana and other states in their *amicus* brief, where only subjective "self-identification" is offered as the basis for the plaintiffs' requests.

Further, nothing in the district courts' injunctions restricts a school district's ability to monitor student conduct in bathrooms and locker rooms. If a student enters a girls' locker room and engages in misconduct, that student has violated school rules regardless of whether the student is a girl who is properly in the space, a boy who is improperly in the space, or a boy who pretends to be a transgender girl to gain school-authorized access to the space. As the *amicus* brief of school administrators from 16 states and the District of Columbia assures us, "schools generally are adept at disciplining students for infractions of school rules," and gender-affirming access policies neither thwart rule enforcement nor increase the risk of misbehavior in bathrooms and locker rooms. We are also unconvinced that students will take advantage of gender-affirming facility access policies by masquerading as transgender. Based on the accounts of *amici* school administrators who have implemented gender-affirming facility access policies, such a scenario has *never* materialized.

### 2. Irreparable Harm

"[P]laintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of

an injunction." *Winter*, 555 U.S. at 22. Irreparable harm occurs when the "legal remedies available to the movant are inadequate." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022).

Both district courts determined that the plaintiffs were likely to suffer irreparable harm, noting the similarities between the cases of A.C., B.E. and S.E. and the plaintiff in *Whitaker*. The school districts attempted to distinguish *Whitaker*, pointing out that A.C. did not report suicidal ideation and that B.E. and S.E. did not show they had restricted water intake. But the district courts found those factual distinctions insignificant.

We have little to add to their analysis, except to note again that the district courts based their decisions on facts in the record, and that the school districts have not shown clear error. The plaintiffs have established that the harm they face is ongoing, debilitating, and cannot be remedied with monetary damages. Although the plaintiff in *Whitaker* experienced suicidal thoughts, that is not essential for these cases.

### 3.   Balance of Equities and the Public Interest

Before issuing an injunction, courts are required to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). This includes "particular regard for the public consequences" should the preliminary injunction be issued. *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Both district courts found the school districts' claims of injury unconvincing. In *A.C.*, Martinsville's claims of harm were

unsupported, given that high school students were granted accommodations without incident. Similarly, in *B.E.*, the plaintiffs had used the boys' bathrooms at the beginning of the year without incident and there was no evidence of harm to Vigo County in the record. The records showed only speculative harms, which are not enough to tip the balance. See *Whitaker*, 858 F.3d at 1054.

The district courts also agreed that the public interest weighed in favor of issuing the injunctions. They noted that protecting civil and constitutional rights is in the public interest, and they saw no harm to the public. The district court in *A.C.* acknowledged the importance of individual privacy interests to the public, but A.C.'s presence in the boys' bathroom did not threaten those privacy interests. And the district court in *B.E.* observed that the school district's insistence upon the need for executive or congressional guidance was undermined by the fact that *Whitaker* has been controlling law in the Seventh Circuit since 2017. Indeed, Vigo County crafted an effective written policy to manage gender-affirming facility access despite the lack of additional rulemaking or legislation.

There was no abuse of discretion in this balancing of the equities and the public interest. Nor do we see either legal error in the underlying analysis or clear error in any of the supporting factual findings. That is enough to resolve these appeals.

## III

These consolidated appeals are almost indistinguishable from *Whitaker*. Because our reasoning in *Whitaker* controls, we AFFIRM the orders granting the plaintiffs' motions for preliminary injunctions.

EASTERBROOK, *Circuit Judge*, concurring. Given *Whitaker v. Kenosha School District*, 858 F.3d 1034 (7th Cir. 2017), this is an easy case for the plaintiffs. I am no more disposed than my colleagues to overrule *Whitaker*. A conflict among the circuits will exist no matter what happens in the current suits. The Supreme Court or Congress could produce a nationally uniform approach; we cannot.

I concur only in the judgment, however, because, although I admire my colleagues' thoughtful opinion, they endorse *Whitaker*, while I think that *Adams v. St. Johns County School Board*, 57 F.4th 791 (11th Cir. 2022) (en banc), better understands how Title IX applies to transgender students.

My colleagues express confidence that Title VII (the subject of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)) and Title IX use "sex" in the same way. See slip op. 13–14. The majority in *Adams* was equally confident of the opposite proposition. I am not so sure about either view. Title IX does not define the word, which can refer to biological sex (encoded in a person's genes) or to social relations (gender). Sex is such a complex subject that any invocation of plain meaning is apt to misfire. I think, however, that *Adams* is closer to the mark in concluding that "sex" in Title IX has a genetic sense, given that word's normal usage when the statute was enacted.

Indiana has elected to use a social definition rather than a genetic one; the state's judiciary has entered orders classifying all three plaintiffs as boys. Like my colleagues (see slip op. 21) I'm puzzled that the school districts did not act on the logical implication of these orders. Much of life reflects social relations and desires rather than instructions encoded in DNA. Nurture and nature both play large roles in human life. Classifying as "boys" youngsters who are *socially* boys (even if not

genetically male) is an act of kindness without serious costs to third parties. But if Title IX uses the word "sex" in the genetic sense, then federal law does not compel states to do this.